**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:18-cv-00089-MR**

| | |
|---|---|
| **JORDAN ANDREW JONES,** ) | |
| ) | |
| **Plaintiff,** ) | **MEMORANDUM OF** |
| ) | **DECISION AND ORDER** |
| **vs.** ) | |
| ) | |
| **GEORGE T. SOLOMON, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for
Summary Judgment [Doc. 90] and the Defendants' Motion for Summary
Judgment [Doc. 96].

## I.    BACKGROUND

The incarcerated Plaintiff Jordan Andrew Jones ("Jones" or "the
Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983
stemming from various incidents that allegedly occurred at the Avery Mitchell
Correctional Institution ("AMCI").[1]  The Complaint passed initial review on
several claims.  [Doc. 1; Doc. 11].

_____

[1] The Plaintiff is currently incarcerated at the Harnett Correctional Center.

The Plaintiff then filed an Amended Complaint asserting claims against AMCI Officers Joseph Buchanan, Stephen P. Carpenter, Mary Cooper, Gilbert Lewis, and Scotty Lowery; AMCI Superintendent Mike Ball; AMCI Sergeant Bondy Carroll; AMCI Lieutenant Timothy K. Penland;[2] AMCI Assistant Superintendent of Programs Jason M. Penland; AMCI Correctional Captain Renae Reel;[3] AMCI Classification Coordinator Tim Laughrun; AMCI Assistant Superintendent of Custody Gregory P. Taylor; North Carolina Department of Public Safety ("NCDPS") Disciplinary Hearing Officer ("DHO") Randy S. Mull; NCDPS Secretary Frank L. Perry; NCDPS Director of Prisons George T. Solomon; and NCDPS Chief Deputy for the Department of Adult Corrections and Juvenile Justice W. David Guice. [Doc. 21]. The Amended Complaint passed initial review on the Plaintiff's claims that he was exposed to unsanitary conditions of confinement while he was under close observation in a restrictive housing unit; that the supervisory Defendants failed to train and supervise staff regarding sanitation for inmates under close

---

[2] "John Doe" in the Amended Complaint. The Defendants' Motion for Summary Judgment confuses Jason and Timothy Penland and fails to address these Defendants separately. [See 97 at 2, n.1] (identifying the John Doe Defendant alternatively as Jason Penland and Timothy Penland).

[3] "Reene Reel" in the Amended Complaint. The pleadings and exhibits refer to this Defendant interchangeably as Renee Reel, Renae Reel, and Frances Reel. See https://www.ncdps.gov/employee/607e981e39ec7d614f9867e4 (NCDPS Employee Directory for "Frances Renae Reel").

2

observation; that he was placed in administrative restrictive housing without due process; that he was denied due process by not receiving an opportunity to present evidence at a prison disciplinary proceeding; and that he was subjected to a retaliatory transfer.  [Doc. 23].

The parties have now filed cross-motions for summary judgment.[4] [Doc. 90; Doc. 96].  The Court entered a Roseboro[5] order notifying the Plaintiff of the opportunity to respond to Defendants' Motion and to present evidence in opposition pursuant to Fed. R. Civ. P. 56.  [Doc. 100].  The Plaintiff filed a Response to the summary judgment motion and a supporting memorandum.  [Doc. 103; Doc. 104].  The Defendants did not file a reply. [Doc. 105].

Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

---

[4] Defendants rely *inter alia* on their Interrogatory Responses in support of their Motion for Summary Judgment.  Defendants Buchanan, Carpenter, Carroll, Cooper, Guice, Laughrun, Lewis, Lowery, Mull, J. Penland, Perry, Reel, Solomon, and Taylor filed verifications in support of the Interrogatory Responses.  [Doc. 98-1].

[5] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175,

4

180 (4th Cir. 2000).  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.  FACTUAL BACKGROUND

The parties' forecasts of evidence show the following, which is undisputed except as otherwise noted.

While searching an inmate on April 27, 2015, Officer Stockton[6] saw the Plaintiff pick up an object on a nearby chair and place it in his mouth.[7]  [Doc. 21 at ¶ 46; Doc. 1-4 at 2].  Officer Stockton instructed the Plaintiff to spit and

---

[6] No claims against Officer Stockton passed initial review.

[7] The Plaintiff asserts that the object was a piece of candy.  [Doc. 21 at ¶ 47].

5

open his mouth but was unable to find the object. [Doc. 21 ¶¶ 47, 48; Doc. 1-4 at 2-3].

After Defendant Carroll viewed the video surveillance from the dorm, he instructed Officer Stockton to escort the Plaintiff to the Restrictive Housing Unit for close observation on suspicion of consuming contraband. [Doc. 21 at ¶ 84; Doc. 1-4 at 3]. The Plaintiff was placed in a "dry cell" in the Restrictive Housing Unit without water or plumbing at approximately 1:10 p.m. for close observation.[8] [Doc. 1-4 at 3; Doc. 91-7 at 1]. The Plaintiff was told that he would have to produce three bowel movements before he would be released from the Restrictive Housing Unit. [Doc. 1-4 at 3].

At approximately 2:00 p.m., the Plaintiff produced a bowel movement, which Defendants Cooper and Lewis reviewed without discovering any contraband. [Doc. 21 at ¶ 87; Doc. 91-7 at 1].

The Plaintiff was given dinner at approximately 4:00 p.m. [Doc. 91-7 at 1]. The Plaintiff alleges that he was not given supplies to wash his hands after the bowel movement and that he had to eat his dinner with his hands because he was not given utensils.[9] [Doc. 21 at ¶ 88; Doc. 1-4 at 4].

---

[8] Defendant Reel asserts that the water in the Plaintiff's cell was on. [Doc. 91-3 at 10].

[9] The Defendants assert that hygienic materials are provided to all offenders in accordance with applicable policies and procedures, eating utensils and napkins are provided with meals, and cleaning products are available upon request. [Doc. 91-3 at 10].

6

The Plaintiff then produced a second bowel movement, supervised by Defendants Cooper and Carpenter. [Doc. 21 at ¶ 89; Doc. 91-7 at 1]. No contraband was found. [Id.]. The Plaintiff was provided fresh clothing at 7:42 p.m. [Doc. 91-7 at 1].

The Plaintiff produced a third bowel movement at approximately 9:15 p.m., supervised by Defendants Lowery and Buchanan. [Id. at ¶ 90; Doc. 91-7 at 1]. While the Plaintiff requested toilet paper immediately after his bowel movement, his request was denied at that time. [Doc. 21 at ¶ 92]. The Plaintiff alleges that Defendants Lowery and Buchanan appeared to be uncertain about how to proceed and, "on information and belief," Defendant Reel instructed Defendants Lowery and Buchanan to have the Plaintiff inspect his own feces. [Doc. 21 at ¶¶ 90, 91]. The Plaintiff asserts that while he protested that this was not the procedure that had been followed for the preceding bowel movements, Defendants Lowery and Buchanan ignored that information and ordered him to inspect the feces. [Id. at ¶ 93]. The Plaintiff then parsed his own feces with two wooden tongue depressors. [Doc. 98-4]. While the Plaintiff asserts that he complied with the order because he feared that he would receive a disciplinary charge if he disobeyed the orders, the video footage submitted by the Defendants shows

the Plaintiff smiling and laughing while speaking the officers.  [Id. at ¶ 94 & n.21; Doc. 98-4].[10]

After the Plaintiff finished the inspection, Defendant Buchanan examined the stool and found no contraband.  [Doc. 91-5 at 1; Doc. 91-7 at 1].  The Plaintiff was given toilet paper.  [Doc. 21 at ¶ 102].  The Plaintiff alleges that he was not given materials to wash his hands or hygienic materials to clean his cell after each bowel movement.[11]  [Doc. 1-4 at 5].

The Plaintiff was no longer monitored after the third bowel movement.  [Doc. 21 at ¶ 102].  The Plaintiff was given a cup of water and a blanket at approximately 11:00 p.m.  [Doc. 1-4 at 5].  The water was restored to the Plaintiff's cell the following morning, April 28, 2015.  [Doc. 21 at ¶ 103; Doc. 1-4 at 5; Doc. 91-8 at 1].  The Plaintiff received a shower at 7:07 p.m. and was given soap and cleaning supplies at around 8:00 p.m. on April 28.  [Doc. 91-7 at 3; Doc. 21 at ¶ 103; Doc. 1-4 at 5].  The Plaintiff was released from restrictive housing on April 29, 2015.[12]  [Doc. 95-5 at 2].

---

[10] The Defendants assert that offenders are never instructed to inspect their own feces but that the Plaintiff was permitted to do so, upon his request, because he expressed concern that staff was going to "set him up."  [Doc. 91-3 at 10].

[11] Defendant Reel asserts that hygiene materials were placed outside the Plaintiff's door and offered for use, but that the Plaintiff did not wish to use them.  [Id.].

[12] The Plaintiff asserts that he was released from restrictive housing on April 30, 2015. [Doc. 21 at ¶ 65; Doc. 1-4 at 5].

8

On April 30, 2015, the Plaintiff was issued an infraction for interrupting Officer Stockton's search on April 27. [Doc. 21 at ¶ 66; Doc. 1-4 at 5]. The Plaintiff sought reinvestigation by an "unbiased" official. [Doc. 21 at ¶ 67; Doc. 1-4 at 5].

On May 5, 2015, the Plaintiff pleaded guilty to the infraction and received sanction, including the loss of 20 days of credit time. [Doc. 98-3 at 4-6; Doc. 1-4 at 6]. The waiver that the Plaintiff signed on May 5 states:

> I have received a written notice of violation of the following offense(s) and hereby freely acknowledge that I am guilty of the offense(s). I am willing to waive a hearing before the hearing officer and I accept the following reduced penalty/penalties for offense(s) set out below. This waiver also waives the right to appeal. I fully understand my right to a hearing and I have not been coerced or intimidated by anyone into signing this waiver.

[Doc. 98-3 at 6]. Defendant Mull refused to review the folder of evidence that the Plaintiff brought to the hearing. [Doc. 21 at ¶ 155-56; Doc. 1-4 at 6].

The officers involved in the third stool inspection on April 27 were recommended for disciplinary action for showing "poor judgment" in allowing the Plaintiff to inspect his stool, which is "clearly a policy violation." [Doc. 91-6 at 4].

On May 7, 2015, the Plaintiff filed a grievance about an alleged use of force on April 27. [Doc. 1-4 at 26]. On May 27, 2015, the Plaintiff filed a

9

grievance about the conditions he experienced in close observation, including the allegedly unsanitary conditions and being forced to inspect his bowel movement. [Doc. 1-5 at 19; see Doc. 1-6 at 7]. The Plaintiff alleges that he spoke to Restrictive Housing Sergeant Hundley after submitting the grievance.[13] At that time, Hundley was upset, wanted to know what happened, and stated "with accusations like this, against staff, you will probably be transferred when you finish your time in Restrictive Housing.'" [Doc. 1-4 at 7]. The Plaintiff filed an "extension" to the grievance on August 6, 2015 alleging *inter alia* a failure to train and supervise staff regarding close observation procedures. [Doc. 1-6 at 3]. The Step Three response dated September 30, 2015 states that "[i]t appears that your grievance does have merit and corrective action has been taken" and states that grievance was considered resolved. [Doc. 1-10 at 4].

Defendant Buchanan told Inmate Conor O'Neill on June 22, 2015 that Buchanan had been reassigned from segregation due to the April 27 incident. [Doc. 1-6 at 1-2]. When Inmate O'Neill expressed surprise that the Plaintiff had not been transferred away from AMCI, Buchanan stated that the Plaintiff would "probably be on a bus after Administrative Remedy Procedures are complete." [Id.].

---

[13] The Plaintiff states in the affidavit that the grievance was submitted on May 26.

On August 5, 2015, the Plaintiff filed a grievance about the May 5 disciplinary proceedings. [Doc. 1-8 at 6].

On August 7, 2015, Unit Manager Johnson[14] called the Plaintiff to his office and asked whether the Plaintiff was filing grievances because he was seeking a transfer. [Doc. 1-4 at 8]. The Plaintiff stated that he was not seeking a transfer. Johnson responded "I can't tell.'" [Id.].

The Plaintiff also filed a number of grievances and wrote letters complaining that the administrative review procedures were not being appropriately followed. [Doc. 1-9 at 11; Doc. 1-6 at 10; Doc. 1-9 at 13; Doc. 1-7 at 1; Doc. 1-11 at 3].

On October 13, 2015, the Plaintiff had a conversation with Defendant Taylor about his grievances, including the alleged policy violation on April 27. At the meeting, Defendant Taylor asked the Plaintiff to "ease up" on the grievances and stated that they "were not helping [the Plaintiff] stay at Avery-Mitchell Correctional." [Doc. 1-4 at 9].

On October 15, 2015, the Plaintiff was transferred to Lanesboro C.I.[15] in a "[s]wap agreed upon by Edward Gazoo & Tim Laughrun" due to

---

[14] The Plaintiff's claims pertaining to Johnson did not pass initial review. [See Doc. 23].

[15] Now Anson Correctional Institution.

"numerous issues with staff which could lead to security issues in the future."
[Doc. 91-10 at 1-2; Doc. 21 at ¶ 140]. The Plaintiff never requested a
transfer. [Doc. 21 at ¶ 140]. The Plaintiff alleges that Lanesboro was widely
known to be a dangerous facility, had a worse reputation than AMCI, and
housed an inmate who had previously assaulted him. [Doc. 1-4 at 9]. The
Plaintiff was transferred back to AMCI on October 27, 2015 after his mother
complained about the transfer to NCDPS regional director Todd Pinion.[16]
[Doc. 21 at ¶ 146]. The transfer back to AMCI was another swap between
facilities "[p]er administration at Avery Mitchell and regional director." [Doc.
91-11 at 2-3].

## IV. DISCUSSION

### A. Conditions of Confinement

The Plaintiff first brings an Eighth Amendment claim alleging that the
condition in restrictive housing were unsanitary and inhumane.

The Eighth Amendment protects prisoners from inhumane methods of
punishment and from inhumane conditions of confinement. Williams v.
Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "Prison conditions may be harsh
and uncomfortable without violating the Eighth Amendment prohibition
against cruel and unusual punishment." Dixon v. Godinez, 114 F.3d 640,

---

[16] Mr. Pinion is not a Defendant in this case.

642 (7th Cir. 1997).  Rather, extreme deprivations are required, and "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation omitted)).  Further, a plaintiff must allege and prove facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm.  See Farmer v. Brennan, 511 U.S. 825, 847 (1994).

The Plaintiff first alleges that his cell lacked running water and he was not given supplies to clean his cell.  While a lack of running water for approximately seventeen hours and a lack of soap or cleaning supplies for twenty-nine hours may be sufficiently serious to implicate the Eighth Amendment, the Plaintiff presents no forecast of evidence that the Defendants were aware of, and deliberately disregarded, a known risk to his health or safety due to the lack of running water, soap, cleaning materials for this relatively brief period.  Accordingly, the Defendants could not have been deliberately indifferent to a serious risk of harm.

The Plaintiff next alleges that he was not given eating utensils on the afternoon of April 27 and that he was forced to eat his meal that afternoon with feces-contaminated hands.  Assuming that the Plaintiff's hands were not

13

clean and that he was not given utensils with dinner on April 27, this is not adequately serious as missing a single meal does not rise to the level of an Eighth Amendment violation.  See White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1993) (affirming dismissal of an Eighth Amendment claim about missing one meal as frivolous and indisputably meritless).  Moreover, the Plaintiff has failed to forecast any evidence that the omission of eating utensils was caused by, or even known to, any Defendant.  [Doc. 91-3 at 11].  Accordingly, the lack of utensils cannot serve as the basis for an Eighth Amendment claim.

The Plaintiff further alleges that; he had feces and urine on his hands, clothing, and arms for an extended period and that he was not immediately given toilet paper after defecating.  The video of the segregation cell at around 9:00 p.m. on April 27, 2015 refutes the Plaintiff's claim that his hands, arms, and clothing were soiled.  The video further indicates that the Plaintiff was given toilet paper 105 seconds after completing his bowel movement. As such, the video demonstrates that the conditions of the Plaintiff's confinement were not serious enough to implicate the Eighth Amendment. Accordingly, those actions are not a basis for an Eighth Amendment claim.

The Plaintiff also alleges that Defendant Buchanan forced him to inspect his own feces and that he was not provided with personal protective

equipment to do so. The video of the incident reflects that the Plaintiff was laughing and talking with Defendants Buchanan and Lowery, that he came forward and reached for the tongue depressors in an officer's hands, and that he briefly inspected the feces with the tongue depressors. Assuming *arguendo* that he was forced to conduct the inspection, he has failed to forecast any evidence that the brief inspection with tongue depressors contaminated him with feces or exposed him to a serious risk of harm of which the Defendants were aware, and deliberately disregarded. While the feces inspection may have violated NCDPS policy, the violation of prison policy, without more, is insufficient to establish a § 1983 claim. See Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) (unpublished) (holding that "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of constitutional violation"). Accordingly, the required self-inspection of the Plaintiff's feces cannot serve as the basis for an Eighth Amendment claim.

Even if the Plaintiff had presented a forecast of evidence establishing an Eighth Amendment violation, the Plaintiff does not allege that he incurred any physical injury from any of the foregoing actions. Therefore, to the extent that the Plaintiff seeks damages based on mental or emotional injury, his claim is barred. 42 U.S.C. § 1997e(e) ("No federal civil action may be

15

brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."); see Mayfield v. Fleming, 32 F. App'x 116 (4th Cir. 2002) (unpublished) (finding that "the district court correctly concluded that [plaintiff's] claim for money damages is barred because he can show no physical injury.").

The Defendants will therefore be granted summary judgment on the Plaintiff's claims alleging that the conditions in restrictive housing violated the Eighth Amendment.

## B. Policy, Training and Supervision

The Plaintiff further alleges that the supervisory Defendants failed to maintain adequate policies and failed to adequately train and supervise their staff regarding sanitation procedures in close observation.

A state official can be sued in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity. King v. Rubenstein, 825 F.3d 206, 223–24 (4th Cir. 2016).  For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985).  In an official-capacity suit, however, "[m]ore is required:" the suit is "treated as a suit against the entity," which

must then be a "'moving force' behind the deprivation," King, 825 F.3d at 223 (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); thus, the entity's "'policy or custom' must have played a part in the violation of federal law," id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).  Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury."  Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

The Plaintiff alleges that Defendants Solomon, Guice, Perry, and Ball failed to ensure that the policies adequately addressed inmates' ability to clean themselves after exposure to human waste during close observation, and that "upon information and belief," no such policy exists.  [Doc. 21 at ¶ 106].  The Defendants, however, have presented evidence that such policy does exist.  [See Doc. 91-3 at 4] (noting that policies exist concerning, *inter alia*, offender disciplinary procedures; restrictive housing for administrative purposes; conditions of confinement; clothing, bedding & personal hygiene; and close observation procedures); see also Policy & Procedure Manual §

.2106[17] ("Each offender must be provided, at a minimum, soap, [and] toilet paper … as needed.").  The Plaintiff has not forecast any evidence that the policies are inadequate.   Moreover, the Plaintiff's assertions based on information and belief do not satisfy the requirements of Rule 56.  Cottom v. Town of Seven Devils, 30 F. App'x 230, 234 (4th Cir. 2002).

The Plaintiff further alleges that Defendants Ball, Reel, and T. Penland had an obligation to ensure that staff received adequate training in close observation procedure.   The Plaintiff has not presented any forecast of evidence, however, showing that Defendants Ball and T. Penland were aware that their subordinates were engaging in constitutional violations.

With regard to Defendant Reel, the Plaintiff states that Reel instructed Defendants Lowery and Buchanan regarding close observation and that "[u]pon information and belief," she instructed Defendants Lowery and Buchanan to have the Plaintiff inspect his own feces.  [Doc. 21 at ¶ 91].  The Plaintiff's assertion regarding his "information and belief" that Reel instructed Buchanan and Lowery to have the Plaintiff search his own feces fails to satisfy Rule 56.  See Cottom, 30 F. App'x at 234.  Further, the Plaintiff has failed to present any forecast of evidence demonstrating that a supervisor

---

[17]  The NCDPS's Policy & Procedure Manual is available online at https://www.ncdps.gov/adult-corrections/prisons/policy-procedure-manual.

was deliberately indifferent or tacitly authorized unconstitutional practices, or that there is any affirmative causal link between the alleged violations and their actions or inactions. As such, these claims cannot survive the Defendant's motion for summary judgment.

Moreover, the Plaintiff's supervisory claims cannot proceed because no underlying Eighth Amendment claim has survived summary judgment. Waybright v. Frederick Cnty., MD, 528 F.3d 199, 203 (4th Cir. 2008) ("supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer," at least in suits for damages.") (citation omitted).

Further, the Plaintiff's requests for declaratory and injunctive relief are moot. The Plaintiff now resides at a different prison and the conditions that he encountered at AMCI after he was suspected of consuming contraband appear unlikely to recur. Williams v. Griffin, 952 F.2d 820 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986).

Therefore, the Defendants will be granted summary judgment on the Plaintiff's claims against the supervisory Defendants with regards to policy, training, and supervision.

## C. Due Process

In order to establish a due process violation, "a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988) (citations omitted). If the plaintiff makes such showing, the court considers what process was required and whether any provided was adequate in the particular factual context. Id.

The Plaintiff alleges that Defendants T. Penland and Carroll ordered that he be taken to the Restrictive Housing Unit for close observation without due process. [Doc. 21 at ¶¶ 65, 84].

There is no constitutional right for an inmate to be housed in a particular institution, at particular custody level, or in a particular portion or unit of a correctional institution. See Sandin v. Conner, 515 U.S. 472, 484 (1995); Meachum v. Fano, 427 U.S. 215, 224 (1976) (prisoners do not have a right to due process in their housing assignments). Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." Gaston v. Taylor, 946 F.2d

340, 343 (4th Cir. 1991). As such, a prisoner does not have a right to due process before placement in a more restrictive housing placement unless the conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (citing Wolff v. McDonnell, 418 U.S. 539 (1974)); Wilkinson v. Austin, 545 U.S. 209, 210 (2005).

Whether confinement conditions are atypical and substantially harsh is a "necessarily . . . fact specific" comparative exercise. Beverati v. Smith, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting Sandin, 515 U.S. at 483-84). For safety or security reasons, "prisons and jails may and routinely do place inmates charged with disciplinary infractions in 'administrative segregation' pending their disciplinary hearings, allowing both prison officials and inmates time to investigate and prepare for those hearings." Dilworth v. Adams, 841 F.3d 246, 255 (4th Cir. 2016); see McKune v. Lile, 536 U.S. 24, 26 (2002) (stating that the "decision where to house inmates is at the core of prison administrators' expertise"). Whether such constitutes an atypical and significant hardship turns primarily on: (1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether the assignment to administrative segregation had

any collateral consequences on the inmate's sentence. Smith v. Collins, 964 F.3d 266, 276 (4th Cir. 2020).

The undisputed evidence demonstrates that the Plaintiff was placed in restrictive housing for close observation after an officer witnessed him consume an unknown object during the search of another inmate. It was not atypically and significantly harsh to place the Plaintiff in close observation for a brief period so that his stool could be monitored for potential contraband. Moreover, the Plaintiff has not forecast any evidence that this brief period of administrative segregation had any collateral consequences on his sentence.[18] See Beverati, 120 F.3d at 502 (finding no liberty interest where plaintiffs were confined to administrative segregation based on prison official's belief that they posed a danger to institutional security). Accordingly, the Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact for trial, and therefore, the Defendants will be granted summary judgment on this claim.

The Plaintiff further alleges that Defendant Mull violated his right to present evidence at the May 5, 2015 disciplinary hearing. [Doc. 21 at ¶¶ 155-56, 243].

---

[18] The record demonstrates that the Plaintiff was sanctioned for a disciplinary infraction pursuant to prison disciplinary procedures. See Section B(ii), *infra.*

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings do[ ] not apply." Wolff, 418 U.S. at 556. To provide constitutionally sufficient procedural due process, a disciplinary proceeding must provide: (1) written notice of a claimed violation at least 24 hours before any disciplinary hearing; (2) the ability of the prisoner to call witnesses and present documentary evidence at the disciplinary hearing; and (3) a written statement of the evidence relied upon by the factfinder and the reasons for the disciplinary action taken. See Dilworth, 841 F.3d at 253 (citing Wolff, 418 U.S. at 563-66).

It is undisputed that the Plaintiff pleaded guilty to the charge on May 5, 2015. In doing so, the Plaintiff waived a disciplinary hearing as well as his right to present evidence at such a hearing. [Doc. 98-3 at 6]. Defendant Mull did not violate the Plaintiff's due process rights by refusing to consider evidence on a charge to which the Plaintiff pleaded guilty and waived a disciplinary hearing. Pevia v. Comm'r of Corr., 2018 WL 4052243 (D. Md. Aug. 23, 2018) (prisoner who pleaded guilty to disciplinary infractions waived his opportunity to be heard). The Plaintiff has failed to present any forecast of evidence that a due process violation occurred in relation to the

disciplinary proceeding. Accordingly, the Defendants will be granted summary judgment on this claim.

### D. Retaliatory Transfer

Finally, the Plaintiff alleges that he was transferred to Lanesboro C.I. in retaliation for filing grievances.

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000). Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978). In order to state a colorable retaliation claim under § 1983, a plaintiff must allege: "(1) [ ]he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005)). A plaintiff suffers adverse action if the allegedly retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Id. A plaintiff "must show that the defendant's conduct resulted in something more

than a '*de minimis* inconvenience' to her exercise of First Amendment rights." Constantine, 411 F.3d at 500 (quoting ACLU of Md., Inc. v. Wicomico Cnty., Md., 999 F.2d 780, 786 n.6 (4th Cir. 1993)).  A plaintiff's actual response to retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity.  Constantine, 411 F.3d at 500.  In the prison context, retaliation claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

The Plaintiff alleges that Defendants Ball, Penland, Taylor and Laughrun, who were in control of his classification, transferred him to Lanesboro C.I. in retaliation for his filing of grievances.  [Doc. 21 at ¶¶ 144, 231].  The Plaintiff alleges that Defendants Buchanan, Taylor, Johnson and Sergeant Hundley made statements that implied that he would be transferred because of his grievances, and that he was transferred to Lanesboro just six days after his grievance and two days after he met with Defendant Taylor to discuss his grievances.  He further alleges that Lanesboro was widely known to be dangerous and a worse prison than AMCI; that an inmate who had previously assaulted the Plaintiff was housed at Lanesboro C.I. at the time;

and that he was assigned to a computer applications class at AMCI at the time of the transfer. [Doc. 1-4: Plaintiff's Affidavit at 9].

The Plaintiff has failed to forecast evidence that the Defendants took any adverse action against him. Transfers are common and necessary part of prison life over which prison authorities have broad administrative discretion. See generally Olim v. Wakinekona, 461 U.S. 238 (1983); O'Bar v. Pinion, 953 F.2d 74 (4th Cir. 1991) ("Prison officials are given broad administrative discretion over the management and confinement of inmates," and "[c]hanges in prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges are matters contemplated within the scope of his original sentence to prison."). The Plaintiff alleges generally that Lanesboro was more dangerous and had a worse reputation than AMCI, and that an inmate who had previously assaulted him was housed at Lanesboro. However, the Plaintiff has failed to forecast any evidence that he conditions he experienced at Lanesboro were appreciably different than the ones at AMCI, or that he ever encountered the inmate who previously assaulted him. He has come forward with no evidence that he would be subjected to a different custody classification or other significant change that would deter a person of ordinary firmness from filing prison grievances. See Hoye v. Gilmore, 691

F. App'x 764 (4th Cir. 2017) (transfer to another prison at the same security level and in the same zone, and only about an hour further from the inmate's family was not an adverse action supporting a retaliation claim). Moreover, the Plaintiff's numerous subsequent grievances and letters demonstrate that he was not deterred by the allegedly retaliatory transfer. See Constantine, 411 F.3d at 500 (the plaintiff's actual response to retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity); [Doc. 1-10 at 1, 9; Doc. 1-7 at 4, 6, 9; Doc. 1-11 at 3; Doc. 1-9 at 2].

Further, the Plaintiff has failed to present a forecast of evidence to demonstrate that his twelve-day stay at Lanesboro posed more than a *de minimis* inconvenience. Johnson-El v. Beck, No. 3:11-CV-115-RJC, 2011 WL 1155679, at *3 (W.D.N.C. Mar. 25, 2011) (Conrad, C.J.) (transfer to Lanesboro had no adverse effect beyond the inability to complete a class, which was *de minimis*). Accordingly, the Defendants will be granted summary judgment on this claim.

## IV. CONCLUSION

For the reasons stated herein, the Court will deny the Plaintiff's Motion for Summary Judgment [Doc. 90] and will grant the Defendants' Motion for Summary Judgment [Doc. 96].

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 96] is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 90] is **DENIED**.

The Clerk is respectfully directed to terminate this action

**IT IS SO ORDERED.**

Signed: August 9, 2021

Martin Reidinger
Chief United States District Judge